UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No.3:02cr162(SRU) |
| v. | |
| HECTOR SANTIAGO | November 1, 2005 |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

On October 3, 2005, the Second Circuit granted the defendant's motion to remand the case to the district court for re-sentencing in light of the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), and the Court of Appeals' decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). On October 11, 2005, in light of the remand order, the Government filed a motion with the Court seeking, inter alia, an order requesting the filing of sentencing memoranda to address whether a nontrivially different sentence should be imposed in the wake of Booker and Crosby. The Court has issued such an order and asked the parties to file sentencing memoranda on the issue. This memorandum is filed in response to that order. As discussed more fully below, because a nontrivially different sentence should not be imposed in this case, resentencing is not appropriate.

**I.     PROCEDURAL AND FACTUAL BACKGROUND**

On December 21, 2001, at approximately 9:00 p.m., police officers David Uliano and Sean Ronan of the Bridgeport Police Department were on routine patrol in the east end of the city. Officer Uliano was driving, and Officer Ronan was in the front passenger seat. They were in a marked patrol car and dressed in full uniform. They had been working the 3:00 p.m. to 11:00 p.m. shift and were assigned to patrol a span of several city blocks on the east side of the city.

As Officer Uliano was driving northbound on Hallet Street, he turned left onto Ogden Street and illuminated his passenger side "alley light," which is a car-mounted spotlight used to illuminate alleys on either side of the street. There were several apartment buildings near the intersection of Ogden and Hallet Streets, and it was routine for officers to check the alleys behind these buildings. Officer Uliano drove past the alley behind 729 Hallet Street, and he and Officer Ronan observed an individual standing in the alley behind the building. Officer Uliano stopped the patrol car and backed it up several feet so that it was even with the start of the alley.

Officer Ronan got out of the patrol car and used his flashlight to illuminate the individual. He was able to identify him as the defendant, Hector Santiago, someone whom he had known at the time. He called to the defendant, "Come here," but the defendant ignored him, turned around and walked, at a "fast pace," up an exterior staircase which led into the 729 Hallet Street building. As Officer Ronan walked up the staircase after him, Officer Uliano used his flashlight to search the alley for any apparent contraband. He found none.

Officer Ronan walked up the stairs and heard a door open and close on the third floor. He went to the third floor apartment door and knocked. After a short time, an unidentified female answered the door, and Officer Ronan saw the defendant standing behind her in the far side of the kitchen. He asked the defendant to come out of the apartment and talk to him, but the defendant refused. Officer Ronan contacted Officer Uliano, advised him that he was unable to talk with the defendant and told him he would meet him back at their patrol car. The officers then resumed their normal patrol.

Approximately twenty minutes later, they arrived again at the intersection of Hallet and Ogden Streets. Once again, they turned left onto Ogden Street from Hallet Street, and Officer Uliano

directed his passenger side alley light toward the alley behind 729 Hallet Street. They saw the defendant standing in the alley, this time with his back against the wall of the 729 Hallet Street building.

Officer Uliano was the first one out of the car. He directed his flashlight into the alley and caught a glimpse of the defendant's face as he walked toward the exterior staircase; like Officer Ronan, he too recognized the defendant from prior interactions. As Officer Uliano quickened his pace, so did the defendant. Officer Uliano testified that he was approaching the defendant to talk to him, to "find out why he is in the alleyway." He called out to the defendant, but the defendant ignored him and ran up the stairs. As the defendant got about half way up the first flight of stairs, Officer Uliano, who was between 10 to 15 feet behind him, observed him extend his right arm and throw away a handgun. He testified, "I know a handgun. It had all the characteristics of a handgun. I wasn't that far away, not to question it was a handgun, and I had my light on him. I saw him throw the handgun."

Officer Uliano immediately followed the defendant up the stairs and, as he did so, called on his radio that he was "in foot pursuit of a party who just threw a handgun, Ogden and Hallet." He also yelled to his partner, "Gun, Sean." The chase continued to the third floor, where the defendant banged loudly on an apartment door and was let in just before Officer Uliano could grab him. The apartment door "opened and the door was slammed in my face." He used his radio again to call for a supervisor and let everyone know that he "had a party . . . [who] had dumped a handgun on me and the party went into an apartment . . . ."

When the patrol car had pulled up to the alleyway the second time, Officer Ronan had decided to go to the corner of the building and watch toward the front, in case the defendant decided

to go back through the building and out the front entrance. He had seen the defendant turn to flee from his partner, but had turned away before the defendant had run up the stairs and tossed the gun. At that point, he had heard Officer Uliano yell, "Sean, I need you back here, he threw a gun."

Officer Ronan turned and went back into the alley, toward the exterior staircase. Using his flashlight, he illuminated a gun on the ground at the bottom of the stairs, to the right of the stairwell. He picked up the gun and ran up the stairs after his partner. He saw that the gun was cocked, with its hammer back. He did not take the time to uncock it or unload it, because he was pursuing Officer Uliano and the defendant.

When Officer Ronan arrived on the third floor landing, he saw Officer Uliano kicking at the apartment door and yelling, "Bridgeport Police. Open the door." Officer Uliano testified that he was concerned that the defendant might have another firearm on him and that he could pose a danger to those inside the apartment. Officer Ronan showed Officer Uliano the gun and pointed out that it "was cocked." He then placed it down on the floor of the landing, helped Officer Uliano with the door, and pulled out his own duty weapon to cover Officer Uliano as he entered the apartment through the breached door.

There were several individuals in the apartment who were yelling and screaming at the officers, and both officers feared for their safety as they attempted to take the defendant into custody. Officer Ronan had not seen most of these individuals when he had been to the apartment door earlier that night. Officer Uliano entered the apartment with his gun drawn, grabbed the defendant by the arm, led him out to the landing and handcuffed him with the help of other officers who, by that time, had arrived as backup in response to the calls on the police radio.

At that point, Officer Ronan reholstered his own weapon and picked up the gun from the

landing. He continued to handle it with great care because it was cocked, and he was concerned that it could discharge and jeopardize the safety of the other officers and the residents of the apartment, who were all standing on the landing. He took the gun down to his patrol car, uncocked it and removed its magazine. He identified it as a Llama .380 caliber handgun with serial number 570415. It was loaded with four hollow-point bullets, one of which was in the chamber.

The parties stipulated that, prior to December 21, 2001, the defendant had been convicted of a felony offense. As to the interstate commerce element, ATF Special Agent John Fretts testified that the gun at issue had been manufactured in Spain and imported into this country through Hackensack, New Jersey.

On June 4, 2002, a federal grand jury returned a one-count indictment charging the defendant with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On October 1, 2002, a trial jury found the defendant guilty of the offense charged.

At sentencing on March 3, 2003, the Court concluded that, under U.S.S.G. § 2K2.1(a)(2), the defendant's base offense level was 24 as a result of his two prior convictions for controlled substances offenses, and that two levels should be added to the offense level because the defendant had possessed a stolen firearm. The Court also concluded that the defendant was in Criminal History VI as a result of accumulating fourteen criminal history points, so that his guideline range was 120-150 months incarceration, which was limited by the statutory maximum 120 months' incarceration under 18 U.S.C. § 924(a)(2).

Among other things, the defendant moved for a downward departure under U.S.S.G. § 4A1.3 (overstatement of criminal history). The Government objected to the motion, pointing out that the defendant would have accumulated far more than fourteen points had several prior state convictions

counted under § 4A1.1. The Court, however, agreed with the defendant and departed horizontally by two categories. In summary, the Court ruled as follows:

> Under 4A1.3, I'm going to grant the motion for the following reasons. Mr. Santiago's criminal history is long but is not especially deep and in a couple of senses. First, the conduct for which he has been arrested and convicted in the past is not of the seriousness that one normally sees in a category six offender, specifically there is a robbery charge at the age of 16. It's unclear frankly whether there was any violence or threat of violence in that conviction but it was a very long time ago and it was appropriately not scored in the guideline calculation. . . . We have two controlled substance offenses at the age of 22. These were almost ten years ago. That is, the conduct was over ten years ago, the convictions were nearly ten years ago, and the quantities of drugs involved there were quite small by, again, by standards of the folks that we often see in a category six. . . . The only other term of incarceration was the six month period reflected for violation of probation in connection with the events surrounding the arrest that is at issue in the current offense. So what we have is in the period since 1988, by my calculation, prior to his current arrest, Mr. Santiago has spent a total of 17 months incarcerated and yet managed to earn 12 points for the conduct that led to that . . . . I don't totally discount Mr. Spector's argument that things could well have been different and that in some sense this criminal history may under-represent the seriousness, but I have to deal with the sentences that were handed out . . . . So I'm going to grant the motion for downward departure. When I make a horizontal departure, I'm supposed to stop at the first level that I think adequately reflects the seriousness of the past criminal history, and in this case, although an argument might be made that it should stop at five, I believe that a four most accurately represents the seriousness of Mr. Santiago's past criminal history.

At an offense level of 26 and a Criminal History Category IV, the defendant faced a guideline range of 92-115 months' incarceration. The Court sentenced the defendant to 96 months' incarceration, followed by three years' supervised release. In doing so, the Court advised the defendant,

> Mr. Santiago, I'm just going to leave you with the following thought. Under the sentencing guidelines, which govern all cases in federal court, . . . you were facing both a maximum and minimum of ten years in prison, and I realize that you think that eight years in prison is a long time and probably more than you think you deserve, but I think you need to recognize that you're here today because of the conduct that you've engaged in both with respect to this offense and with respect to past offenses, and that you have the opportunity to change your life while you're in prison . . . .

On March 3, 2003, the defendant filed a timely notice of appeal. He raised three issues: first, he claimed that 18 U.S.C. § 922(g) violated the Commerce Clause of the Constitution; second, he

6

claimed that the Court committed harmful, evidentiary error in admitted supposed hearsay testimony; and third, he argued that the court's instruction on possession was incorrect. On September 16, 2004, the United States Court of Appeals for the Second Circuit affirmed the defendant's judgment of conviction by summary order. Although the defendant did not challenge his sentence in his direct appeal, at oral argument he claimed that the Supreme Court's decision Blakely v. Washington, 124 S. Ct. 2531 (2004), could impact the validity of his sentence. On September 20, 2005, the defendant filed a motion with the Second Circuit to recall the mandate and remand the case for resentencing in light of the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005). The Government did not object to this motion. On October 3, 2005, the Second Circuit granted the motion and remanded the case to the district court for re-sentencing.

## II.     DISCUSSION

### A.     Sentencing in the Wake of Booker

In United States v. Booker, 125 S. Ct. 738, the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). See Booker, 125 S. Ct. at 755. The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. See id. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S. Ct. at 757. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." Id. at 766.

The Court of Appeals for the Second Circuit has offered some initial guidance to sentencing courts on how to proceed with sentencings in the wake of Booker. In Crosby, the Court summarized the impact of Booker as follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). <u>Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range</u>, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. <u>Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence</u>. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Id., 397 F.3d at 113 (emphasis added).

In other words, a sentencing now involves two analytic stages: first, a determination of the applicable Guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence.

As to Stage One, the applicable Guideline range "is normally to be determined in the same manner as before Booker/Fanfan." Crosby, 397 F.3d at 112. In limited circumstances, "precise calculation of the applicable Guidelines range may not be necessary" when a judge determines that either of two (not necessarily overlapping) ranges applies, and if "the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." Id. Such may be true in cases involving "complicated matters, for example, determination of monetary loss," or "close questions . . . as to the precise meaning or application of a policy statement authorizing a departure." Id. In general, however, Stage One

requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range.  See id.

As to Stage Two, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from the guideline range indicated in Stage One.  These factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.  See Crosby, 397 F.3d at 112-113; 18 U.S.C. § 3553(a).

Because the Guidelines reflect the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a), the Supreme Court and the Second Circuit have made it clear that the Guidelines continue to play a central role in a sentencing court's § 3553(a) calculus. Writing for the remedial majority in Booker, Justice Breyer explained that sentencing courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S. Ct. at 767.  As the Court of Appeals has pointed out, "the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded."

Crosby, 397 F.3d at 111.

> [I] is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

Id. at 113-114.

In the vast majority of cases, a sentence within the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a). This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., Booker, 397 F.3d at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). See also United States v. Wanning, No.

10

4:03-CR-3001-1, slip op. at 6 (D. Neb. Feb. 3, 2005) ("The Guidelines and their ranges were explicitly crafted by the Sentencing Commission at the direction of Congress to implement the statutory purposes of sentencing").

As explained below, this case does not present the rare case in which the Guidelines (including the rules governing departures) fail to produce a sentencing range that fully accords with the various factors set forth in § 3553(a). Moreover, because the Court decided to depart downward at sentencing, it has already taken into account the extent to which the Guidelines failed to produce a sentence in accord with § 3553(a).

**B.    The PSR Properly Calculated the Defendant's Guidelines Sentencing Range at 120 Months of Imprisonment**

In this case, it was undisputed that the defendants' adjusted offense level was 26 based on his two prior felony convictions for controlled substance offenses, and the fact that he had possessed a stolen firearm. It was also undisputed that, based on the number of criminal history points accumulated, the defendant fell within Criminal History Category VI. Therefore, the PSR properly calculated the defendant's guideline range as 120-150 months' incarceration, or an effective range of 120 months based on the statutory maximum penalty under 18 U.S.C. § 924(a)(2).

As discussed above, the Court sentenced the defendant without regard to the mandatory guideline range. Specifically, the Court ruled that the defendant's criminal history category overstated the seriousness of his prior criminal conduct and the risk that he would commit additional crimes in the future. At that point, the Court was faced with the decision as to where to move along the horizontal axis of the sentencing table. On that issue, the Court noted that it could have stopped at a one level departure to Category V, which would have resulted in an incarceration range of 110-120 months, but instead the Court departed to Category IV, resulting in an incarceration range of 92-

115 months. Moreover, the Court imposed a sentence of 96 months, which not the bottom of the guideline range. This sentencing decision, therefore, strongly suggests that the Court was not restrained in any way by the pre-<u>Booker</u> mandatory guideline system, and that a different sentence would not have been imposed in a post-<u>Booker</u> world.

To the extent that the defendant, in support of his request for resentencing, repeats the same arguments that he made in support of his departure request at sentencing, the Court has already considered these arguments, and, as a result, decided to impose a sentence that was 24 months below the guideline range. Whereas the defendant might have been in a better position to argue for a full re-sentencing had his request for a downward departure been denied, the fact that the Court granted the request and departed below the applicable guideline strongly suggests that the mandatory nature of the guidelines did not constrain the Court's sentencing decision.

In addition, to the extent that the defendant bases his request for resentencing on anything that has occurred since his sentencing, the <u>Crosby</u> decision directs that, at this juncture, such information is not relevant. In <u>Crosby</u>, the Second Circuit concluded that "the 'further sentencing proceedings' generally appropriate for pre-<u>Booker/Fanfan</u> sentences pending on direct review will be a remand to the district court, not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine <u>whether</u> to resentence, now fully informed of the new sentencing regime . . . ." <u>Crosby</u>, 397 F.3d at 117 (emphasis in original). The Second Circuit made clear that the district court was to consider "the circumstances existing at the time of the original sentence" in making its determination. <u>See id.</u> Indeed, the court explained, "If, based solely on the circumstances that existed at the time of the original sentence, the sentencing judge decides to resentence, the judge will have to consider the issue of what current circumstances

are to be considered . . . ." Id. at 118 n.19.

### III.    CONCLUSION

The offense of conviction in this case carried a maximum sentence of 120 months' incarceration, which was less than the 120-150 month incarceration range provided for by the applicable sentencing guidelines. The Court imposed a sentence of 96 months' incarceration after agreeing to depart from the effective 120 month guideline sentence. The critical inquiry at this junction is whether the Court would have imposed a nontrivially different sentence than the 96 months had it known that the sentencing guidelines were advisory, not mandatory.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


ROBERT M. SPECTOR
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT18082
450 MAIN STREET
HARTFORD, CT 06103
860-947-1101

# CERTIFICATION

I hereby certify that on this 1st day of November, 2005, a true and correct copy of the foregoing Motion was served by first-class mail upon Mr. David Samel, Esq., 150 Broadway - 20th Floor, New York, NY 10038; Mr. Francis L. O'Reilly, 87 Ruane Street, Fairfield, CT 06430; and Mr. Ray Lopez, United States Probation Officer, United States Probation Office, 915 Lafayette Blvd., Bridgeport, CT.[1]

ROBERT M. SPECTOR
ASSISTANT U.S. ATTORNEY

---

[1] The Government is not certain which defense counsel is representing the defendant for this remand. Attorney Samel was appointed by the Second Circuit to handle the appeal, and Attorney O'Reilly had been previously appointed by the district court to act as trial counsel. In an abundance of caution, the Government is serving both counsel with a copy of this filing.